UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

A.M.K., et al.,

              Plaintiffs,

    v.

CONTRA COSTA COUNTY, et al.,

              Defendants.

Case No. 18-cv-06004-DMR

**ORDER ON DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 56

Defendants Contra Costa County ("the County") and Charm Wright move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs AMK and LTK's second amended complaint ("SAC"). [Docket No. 56.] The court held a hearing on June 13, 2019, and subsequently ordered the parties to submit supplemental briefing, which they timely filed. [Docket Nos. 70-72.] For the following reasons, the motion is granted in part and denied in part. Plaintiffs are granted leave to file a third and final amended complaint by no later than 14 days from the date of this order.

## I.    BACKGROUND

### A.    Allegations in the SAC

This action arises out of the removal in 2014 of Plaintiffs AMK and LTK, who are children (together, the "children") from the custody of their parents, Fred Kueck and Sharon Kueck (for clarity, the court refers to them as "Fred" and "Sharon," and together as the "Kuecks"). Plaintiffs allege that Contra Costa County Children and Family Services ("CFS"), CFS social worker Wright, and 50 Doe Defendants violated their constitutional rights in connection with the juvenile dependency proceedings. [Docket No. 55 (SAC).] Plaintiffs make the following allegations in the

SAC, all of which are taken as true for purposes of this motion.[1]

AMK has "obvious developmental issues" and "a long history of physical development issues and mental disabilities since kindergarten." SAC ¶¶ 32, 34. According to Plaintiffs, AMK's school and medical records documented "a history of physical disability such as a lack of coordination, clumsiness, issues with speech and language . . . [and] lack of bladder and bowel control[.]" *Id*. at ¶ 33. She is "clumsy and uncoordinated" and bruises easily and at some point was "diagnosed with a possibility of having the Elhers-Danlos Syndrome (EDS)," which is "a group of inherited disorders that mostly affect the skin, joints, and blood vessels." *Id*. at ¶ 36. AMK's school and medical records also included a history of mental disabilities, including "disruptive and aggressive behaviors, non-compliance and non-cooperation, rough playing, hurting other children for no reasons, throwing herself hard on the ground, inappropriate disrobing, . . . emotional lability, outbursts and inexplicable inconsolable crying, [and] use of profanity[.]" *Id*. at ¶ 38. In January 2014, AMK began receiving an individual education plan for her special needs. *Id*. at ¶ 40.

In January 2014 and February 2014, Wright interviewed the Kuecks, apparently due to visible bruising on AMK. They informed Wright that AMK had a visible bruise "because LTK threw ice at her at a church event, and that AMK "was clumsy, played rough and bruised easily from a possible genetic disorder." *Id*. at ¶¶ 42, 43. The Kuecks also informed Wright several times that AMK had "developmental delays and issues." *Id*. at ¶ 41. Wright subsequently interviewed the children at their school without their parents' knowledge or consent, and LTK told Wright that he had thrown ice at AMK, causing a bruise. *Id*. at ¶¶ 44, 45.

On June 4, 2014, Wright reported that she received a report from AMK's school that AMK had complained that "her legs hurt from the bruises she got from being hit by Fred with a belt." *Id*. at ¶ 47. Police Officer Pliler, visited the Kuecks' home for a health and safety check, where the children and their older brother told him "that they had never seen a belt used to punish

---

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

AMK." Officer Pliler later reported that AMK has special needs, that he suspected that all of the children in the Kuecks' home have special needs, and that "[h]e could not obtain any evidence of bruises." *Id*. at ¶¶ 48-50.

During a follow-up visit to the Kuecks' home "to investigate," "AMK wore clothes that allowed Wright to observe[ ] that there [were] no bruises on AMK's legs," and Sharon informed Wright that AMK has a genetic disorder that causes her to bruise easily. *Id*. at ¶¶ 51-53. Wright observed a "bump" on Sharon's head that Sharon told her had been caused by a fall during her childhood. Wright later "submitted to the dependency court that she had never seen the bump before, implying that the bump was caused by Fred hitting [Sharon]." *Id*. at ¶¶ 54-55.

On June 5, 2014, Wright went to AMK's school to interview her and school staff "because of a report of abuse." *Id*. at ¶ 58. "[S]ome school staff said they had observed that AMK played rough and threw herself onto the ground." *Id*.

On June 6, 2014, Wright reported that she received a report that "Fred slept in AMK's bed, [and] pushed her out of the bed resulting [in] a mark on her knee." *Id*. at ¶ 59. Wright received another report that "AMK played with two dolls, one male and one female, that AMK made the dolls kiss [each]other," and that AMK "said that Fred kissed her," but "would not tell what kind of kissing." *Id*. at ¶ 60.

Wright then requested permission to "seize the children from their home" with the assistance of sheriff deputies. The sheriff deputies entered the Kuecks' home "by force, arrested Fred with excessive force causing injuries in view of the children," and "helped Wright [take] the children from their home." *Id*. at ¶¶ 61, 63. When Fred asked the officers about a warrant, "the officers told Fred that they did not need any warrant because the social workers told them that the children were in immediate danger," and that "they would do whatever the social worker told them to do." *Id*. at ¶ 62. "LTK was very upset at being taken," and told Wright "that neither he nor AMK were hit." *Id*. at ¶ 64. The children's older brother "called Wright and told her that AMK has a medical conditions [sic] that caused her to fall down a lot, to bruise easily and to tell strange stories." *Id*. at ¶ 65. However, "Wright only reported that the brother told her that Fred hit Sharon." *Id*. at ¶ 66. Wright took the children to the County's investigation center where they

made no "incriminating statement" against Fred. *Id*. at ¶ 69.

In the dependency petitions, Wright alleged that Fred physically abused AMK, including with a belt causing bruises; that Fred displayed a pattern of "irrational, abusive and angry behavior toward AMK"; and that Fred slept in AMK's bed and kissed her inappropriately. *Id*. at ¶¶ 27, 28. Wright further alleged that LTK was in danger because Fred abused AMK and that Sharon failed to protect AMK from physical harm. *Id*. at ¶¶ 29, 30. Based on these allegations, the children were ordered dependents of the court and the parents were denied contact with the children. *Id*. at ¶¶ 31, 67.

CFS placed the children in foster homes. AMK was placed in the home of foster parent Michael Mallett. *Id*. at ¶¶ 70, 72. Plaintiffs allege upon information and belief that at some point, a former foster child reported to law enforcement that Mallett had molested him or her. They further allege that "Mallett committed suicide by cop in 2016 after the police came to arrest him." *Id*. at ¶¶ 73, 74. Plaintiffs do not allege that Mallett abused or molested AMK.

Plaintiffs allege that "state law requires the dependency court to hold a jurisdiction hearing to determine the validity of the allegations in the detention report," and that the court continued this hearing several times. *Id*. at ¶¶ 76, 77. On July 29, 2014, the dependency court returned the children to Sharon's custody with an order that Fred move out of the home. *Id*. at ¶ 78. Plaintiffs allege that AMK came home "with numerous bruises and wearing training pants," and that LTK came home with "a cut lip" and was "traumatized" by the experience of being separated from his family. *Id*. at ¶¶ 79, 81. On August 16, 2014, the court permitted Fred to return home and dismissed the case without prejudice. *Id*. at ¶ 82. As a result of the child abuse allegations, Fred lost his job with the school district. *Id*. at ¶ 71.

At some point in 2016, an officer with the County Sheriff and a social worker visited the Kuecks' home "to inform the parents about Mallett." *Id*. at ¶ 83. Additionally, in 2016, AMK was diagnosed with a "congenital brain malformation," which a doctor concluded "is the cause for many of her disabilities and abnormal behaviors[.]" *Id*. at ¶ 84.

Plaintiffs allege that the County and Wright knew or should have known of AMK's disabilities, had they properly investigated her medical and educational records or consulted with

experts. They further allege that the County did not adequately train Wright to distinguish between child abuse and "actual mental and physical conditions that have nothing to do with child abuse or molestation." *Id*. at ¶¶ 85, 86. According to Plaintiffs, "Wright did not consider that AMK's mental disabilities caused her to be easily susceptible [to] suggestions and coaching from school staff or other third parties[.]" *Id*. at ¶ 87.

The SAC alleges seven claims for relief: 1) a 42 U.S.C. § 1983 claim for violation of the Fourth and Fourteenth Amendments against Wright based on Wright's warrantless seizure of the children; 2) a section 1983 claim for violation of the fourth and Fourteenth Amendments against the sheriff deputies based on their warrantless seizure of the children; 3) a section 1983 claim for violation of the Fourteenth Amendment against Wright and CFS Doe Defendants based on their failure to investigate AMK's condition prior to seizing her and her brother, presentation of false evidence to support the seizure, and failure to provide the dependency court with exculpatory evidence; 4) a section 1983 claim for violation of the Fourteenth Amendment by AMK against CFS Doe Defendants for failing to properly screen Mallett as a foster parent and placing AMK in his home; 5) a section 1983 for violation of the Fourteenth Amendment by LTK against CFS Doe Defendants for the injury he suffered in foster care; 6) a section 1983 claim against the County under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), based on its policies, practices, training, or deliberate indifference to constitutional violations by CFS's employees; and 7) a *Monell* claim against the County based on its policies, practices, training, or deliberate indifference to warrantless searches and seizures of children by sheriff deputies without questioning reports by CFS social workers.

**B.    Procedural History**

The Kuecks filed their complaint on September 28, 2018. The County moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the complaint on numerous grounds, including that the claims are barred by the *Rooker-Feldman* doctrine as well as the failure to comply with the California Tort Clams Act, and are untimely under the applicable statute of limitations. The county also argued that the complaint failed to state a claim. [Docket No. 21.] The Kuecks filed a two-page barebones response in which they stated their intent to file an

amended complaint addressing the issues raised by the County.  [Docket No. 26.]  The court construed the opposition as a request to file an amended complaint and granted the request, ordering the Kuecks to file an amended complaint by January 11, 2019 and warning them to "plead their best case in the amended complaint in light of the deficiencies the County identified in its motion."  [Docket No. 33.]  The Kuecks, along with AMK and LTK, timely filed the FAC, but did not simultaneously request leave to add the children as plaintiffs.

Defendants moved to dismiss the FAC in its entirety.  [Docket No. 41.]  The court held a hearing on March 28, 2019, at which the court granted the motion to dismiss in part and granted leave to join the minor children as plaintiffs.  At the hearing, Plaintiffs conceded that the section 1983 claims brought on behalf of Fred Kueck and Sharon Kueck were time-barred and the court dismissed those claims.  Plaintiffs also withdrew their declaratory and injunctive relief claims. [Docket No. 54 (Minute Order).]  The court ordered Plaintiffs to file any second amended complaint on behalf of the children by no later than April 11, 2019, and ordered that any such complaint be limited to the following claims described by counsel at the hearing: Section 1983 claims based on the seizure of the children, continued detention of the children, and alleged failure to protect the children while they were detained, and *Monell* claims based on the same alleged constitutional violations.  *Id.*

AMK and LTK timely filed the SAC.  On May 1, 2019, the court appointed David Kueck, the children's adult brother, as their guardian ad litem.  [Docket No. 60.]  Defendants now move to dismiss.  At the June 13, 2019 hearing on the motion, Plaintiffs' counsel improperly cited a case for the first time in support of his argument that the *Rooker-Feldman* doctrine does not bar Plaintiffs' first three claims for relief.  Following the hearing, the court ordered the parties to submit briefing regarding the case, *Anderson-Francois v. County of Sonoma*, No. C 08-00724 WHA, 2009 WL 1458240 (N.D. Cal. May 22, 2009), *aff'd in part, appeal dismissed in part and remanded,* 415 F. App'x 6 (9th Cir. 2011), which the parties timely filed.  [Docket Nos. 70, 71 (Defs.' Supp. Br.), 72 (Pls.' Supp. Br.).][2]

_____

[2] On July 29, 2019, Plaintiffs filed a motion for leave to file a supplemental brief, along with the brief, regarding "recently discovered new evidence" that they claim bolsters their *Monell* claims.

**LEGAL STANDARDS**

The County moves to dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(1). The challenging party may make a facial or factual attack challenging subject matter jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In contrast, a factual attack disputes "the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* at 1039. A factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations." *White*, 227 F.3d at 1242 (citation omitted). Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94 (2007) (citation omitted), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556

---

[Docket No. 73.] Defendants opposed the motion. [Docket No. 74.] Plaintiffs offer no explanation about when they learned of the evidence discussed in their brief or why they could not have included it in their opposition brief. Their motion for leave to file the supplemental brief is denied.

U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## III.    DISCUSSION

### A.    The *Rooker-Feldman* Doctrine

Defendants first argue that the court lacks subject matter jurisdiction over this action. They assert that "the entirety of the SAC" is a collateral attack on the state court's child dependency proceedings that resulted in the children being separated from their parents, and that it is therefore barred by the *Rooker-Feldman* doctrine. Mot. 9.

"The *Rooker-Feldman* doctrine is a well-established jurisdictional rule prohibiting federal courts from exercising appellate review over final state court judgments." *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 858-9 (9th Cir. 2008).[3] The "doctrine forbids a losing party in state court from filing suit in federal district court complaining of an injury caused by a state court judgment, and seeking federal court review and rejection of that judgment." *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013). In order to determine whether the doctrine applies, "a district court first must determine whether the action contains a forbidden de facto appeal of a state court decision." *Id.* (citing *Noel v. Hall*, 342 F.3d 1148, 1158 (9th Cir. 2003)). "A de facto appeal exists when 'a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision.' In contrast, if 'a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.'" *Id.* (quoting *Noel*, 342 F.3d at 1164).

---

[3] The *Rooker-Feldman* doctrine is based on two cases, *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923) and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

United States District Court
Northern District of California

If a plaintiff seeks to bring a forbidden de facto appeal, the plaintiff "may not seek to litigate an issue that is 'inextricably intertwined' with the state court judicial decision from which the forbidden de facto appeal is brought." *Id.* (quoting *Noel*, 341 F.3d at 1158). The Ninth Circuit has clarified that the "inextricably intertwined" language "is not a test to determine whether a claim is a de facto appeal, but is rather a second and distinct step in the *Rooker-Feldman* analysis. Should the action *not* contain a forbidden de facto appeal, the *Rooker-Feldman* inquiry ends." *Id.* (emphasis in original) (internal citation omitted).

"The purpose of the doctrine is to protect state judgments from collateral federal attack. Because district courts lack power to hear direct appeals from state court decisions, they must decline jurisdiction whenever they are 'in essence being called upon to review the state court decision.'" *Doe & Assocs. Law Offices v. Napolitano*, 252 F.3d 1026, 1030 (9th Cir. 2001) (quoting *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482 n.16 (1983)). The doctrine applies to both final judgments and "interlocutory state court decisions," *Doe & Assocs.*, 252 F.3d at 1030, and the Ninth Circuit has applied the *Rooker-Feldman* doctrine to child custody and dependency proceedings. *See Watkins v. Proulx*, 235 Fed. Appx. 678, 679 (9th Cir. 2007) (affirming dismissal of action "amount[ing] to a de facto appeal of a state court child custody order" pursuant to *Rooker-Feldman* doctrine); *Lacy-Curry v. Alameda Cty. Soc. Servs. Agency*, 262 Fed. Appx. 9, 10 (9th Cir. 2007) (holding that *Rooker-Feldman* doctrine precluded claims related to state court child dependency proceedings).

Defendants appear to argue that only the first three claims are subject to dismissal based on the *Rooker-Feldman* doctrine, as they do not address the fourth through seventh claims for relief in their discussion of the doctrine. Claims one and two allege constitutional violations based on the warrantless seizure of the children from their home by Wright and the sheriff deputies "when there [were] no exigent circumstances, namely any imminent danger of serious bodily injury[.]" SAC ¶¶ 93, 94, 96, 113, 115, 116. Defendants argue that these claims are barred because they seek review of the state court juvenile dependency proceeding.

"In California, dependency proceedings in the juvenile court are special proceedings governed by their own set of rules as set forth in the Welfare and Institutions Code." *Belinda K. v.*

*Baldovinos*, No. 10-CV-02507-LHK, 2012 WL 464003, at *1 (N.D. Cal. Feb. 13, 2012). Welfare and Institutions Code ("WIC") section 300 describes situations that will bring a child "within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court." Such situations include where "there is a substantial risk that the child will suffer serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian," where "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage . . . as a result of the conduct of the parent or guardian," or where "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of his or her household . . . ." Cal. Welf. & Inst. Code § 300(a), (c), (d).

"A peace officer, probation officer, or social worker, who has reason to believe that a child falls within the definitions set forth in section 300 and is in immediate danger as a result thereof, may remove the child from the home." *Cynthia D. v. Superior Court*, 5 Cal. 4th 242, 247-48 (1993) (citing Cal. Welf. & Inst. Code §§ 305, 306). "A 'detention hearing' must be held by the juvenile court no later than the next judicial day," at which "the department of social services bears the burden of making a prima facie showing that the minor comes within section 300 and that there is a need for detention under specified conditions." *Id*. at 248 (citing Cal. Welf. & Inst. Code § 319(c)); *see also* Cal. Welf. & Inst. Code § 315 (requiring detention hearing to occur "as soon as possible, but in any event before the expiration of the next judicial day after a petition to declare the minor a dependent child has been filed."). Additionally, "[t]he court must make findings regarding whether reasonable efforts were made 'to prevent or eliminate the need for removal of the minor from his or her home' and, if the minor is to be detained, must order services 'to be provided as soon as possible to reunify the minor and his or her family if appropriate.'" *Cynthia D*., 5 Cal. 4th at 248 (citing Cal. Welf. & Inst. Code § 319(f)(1), (g)).

Here, Plaintiffs allege that "[t]he state dependency court held a detention hearing . . . and ordered, upon the recommendation by Wright and CFS, that the children were dependents of the court." SAC ¶ 67. Defendants argue that any constitutional claim premised on the warrantless seizure of the children would necessarily require this court to review the state court's

determination at the detention hearing that AMK and LTK fell within one or more of the circumstances enumerated in WIC section 300. Therefore, they argue, the first and second claims for relief amount to a de facto appeal of the dependency decision and accordingly are barred under *Rooker-Feldman*.

Plaintiffs dispute that their claims seek review of the state court dependency proceedings. They assert that their claims instead challenge the warrantless removal of the children from their parents, and that the state court did not actually determine the propriety of the warrantless removal of the children at the detention hearing or in subsequent proceedings, citing *Anderson-Francois*.

In *Anderson-Francois*, local officials removed two of the plaintiff's children from her custody without a warrant. The county instituted dependency proceedings in state court in accordance with California law and the court held a detention hearing five days after the children were removed from the plaintiff's custody. 2009 WL 1458240, at *2-3. Following the hearing, the court held "that the children should remain detained" based on findings "that [the] plaintiff had 'physically abused minors with excessive corporal punishment,' that there was substantial danger to the children's physical health, and that remaining in [the] plaintiff's care would be contrary [to] the children's welfare[.]" *Id*. at *3. The plaintiff alleged section 1983 claims based on the initial warrantless removal of the children and the detention of the children for the five days between their removal and the detention hearing. *Id*. at *4.

The defendants moved for summary judgment, arguing in part that collateral estoppel or the *Rooker-Feldman* doctrine barred the plaintiff's claims. The court articulated the dispositive question as follows:

> Both the preclusion and *Rooker-Feldman* arguments hinge in large part on whether the juvenile court's findings from the February 6 detention hearing constituted state-court review of the initial *warrantless removal* of the two children (in which case the matter was decided by the state court and plaintiff received adequate due process), or whether the February 6 hearing instead addressed only the need for *continued detention* of the children going forward (in which case the state court did not decide the propriety of the warrantless removal).

2009 WL 1458240, at *5 (emphasis in original). The court noted the absence of authority "squarely addressing whether the detention hearing passed judgment on the propriety of the initial

11

warrantless removal," and examined the relevant provisions of the WIC. *Id.* In particular, the court discussed WIC section 319, which details the requirements for detention hearings and "require[s] the state court (among several other requirements) to '*specify why the initial removal was necessary*' if the court ordered the children detained." *Id.* (emphasis in original); *see* Cal. Welf. & Inst. Code § 319(g). The court found that this requirement "is not the same as [requiring the court to rule on the question of] 'why the initial removal *without a warrant* was necessary." It also found that the determination of "why the initial removal was necessary" was "not quite the same test as demanded by the Ninth Circuit, which is whether, at the time of the seizure, defendants had "reasonable cause to believe that the child [was] in imminent danger of serious bodily injury."" *Id.* at *5-6; *see Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106-07 (9th Cir. 2001). The court concluded that the claims were not barred by collateral estoppel or the *Rooker-Feldman* doctrine because "the juvenile court did not clearly rule on the pre-hearing exigency issue . . . i.e., the propriety of the initial *warrantless* removal, and because no decision has ever found such a detention hearing to bar federal claims in these circumstances[.]" *Anderson-Francois*, 2009 WL 1458240, at *6 (emphasis in original). *See also Zeigler v. Cty. of San Luis Obispo*, No. CV 17-9295-MWF (AFMx), 2019 WL 3082728, at *5-6 (C.D. Cal. May 16, 2019) (holding plaintiff was not collaterally estopped from challenging warrantless removal of her son from her custody because "the issue of the warrantless removal of E.Z. underlying Plaintiff's claims was not actually heard and litigated at the juvenile dependency proceedings," citing *Anderson-Francois*).

Defendants dispute the applicability of *Anderson-Francois*. While Defendants do not contend that the state court expressly determined the propriety of the warrantless removal of the children at the detention hearing, they argue that the state court's standards for detaining the children "are nearly identical" to the federal standard for seizing the children without a warrant. Specifically, they cite WIC section 306, which provides that a social worker may take a child into temporary custody without a warrant when the social worker "has reasonable cause to believe that the child . . . is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety." Cal. Welf. & Inst. Code § 306(a)(2). They

note that at the detention hearing following the initial removal, the state court must order the release of the child unless there is a "prima facie showing . . . that continuance in the parent's or guardian's home is contrary to the child's welfare, and . . . [t]here is a substantial danger to the physical health of the child or the child is suffering severe emotional damage . . ." Cal. Welf. & Inst. Code § 319(c)(1). Defendants assert that these provisions "are nearly identical [to]" and "mesh[ ] with the federal standard," Defs.' Supp. Br. 1, 2, which provides that "[g]overnment officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Mabe*, 237 F.3d at 1106-07 (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000) (citation omitted)).

Essentially, Defendants' position is that even if the state court did not make express findings regarding the necessity of the removal of the children from their parents' custody without a warrant, the facts presented to the dependency court supporting its decision to further detain the children satisfy the federal standard for the warrantless removal. Defendants' position is not persuasive. Defendants ask the court to conclude that the state court's finding "that the children should remain detained" is the same thing as finding that the initial warrantless removal was proper, but as the court in *Anderson-Francois* found, nothing in the relevant WIC provisions requires a state court to address at the detention hearing "why [an] initial removal without a warrant was necessary," let alone address whether it satisfied the Ninth Circuit's standard for such a removal. *See Anderson-Francois*, 2009 WL 1458240, at *5-6 (emphasis removed); *see also Anderson-Francois v. Cty. of Sonoma*, 415 Fed. Appx. 6, 8 (9th Cir. 2011) ("even if the California statutes governing warrantless removal . . . are deemed equivalent to the federal constitutional exigency requirement, the California statutes do not require the judge conducting a detention hearing to make an exigency determination . . ."). The court concludes that Plaintiffs' constitutional claims premised on the warrantless removal of the children from their home are not a de facto appeal of a state court decision. They are therefore not barred by the *Rooker-Feldman* doctrine.

Plaintiffs' third claim alleges that Wright failed to properly investigate reports of AMK's bruises and behavioral problems before separating the children from their parents (SAC ¶¶ 127-131), presented false evidence in the juvenile dependency petitions (SAC ¶¶ 18, 27-31, 136-139), and failed to disclose exculpatory evidence to the juvenile court (SAC ¶¶ 140-141). Plaintiffs allege that "[a]s a direct and proximate result of the failure to investigate, the presentation of false evidence, [and] the failure to present exculpatory evidence," the children's "rights under the 14th amendments [sic] were violated by the warrantless seizures of the children by CFS." SAC ¶ 142. None of these allegations are premised upon "an allegedly erroneous decision by a state court." Instead, they are based upon "an allegedly illegal act or omission by an adverse party," that is, Wright's alleged wrongful conduct before and during the dependency proceedings. *See Bell*, 709 F.3d at 897 ("if a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction." (quotation omitted)). Accordingly, the *Rooker-Feldman* doctrine does not bar the third claim.

Defendants' remaining arguments are that Defendants are entitled to qualified and/or absolute immunity as to certain claims and that the complaint fails to state a claim. The court addresses each of these arguments in turn.

## B. Claims One and Two, Warrantless Removal of the Children

As noted, claims one and two allege that Wright and the sheriff deputies violated the children's Fourth and Fourteenth Amendment rights by seizing them from their home without a warrant in the absence of exigent circumstances. Defendants argue that Wright and the sheriff deputies are entitled to qualified immunity on these claims.[4]

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[4] The court notes that its analysis is complicated by the fact that Defendants made certain arguments in favor of dismissal without specifying which claims are at issue. For example, Defendants' motion appears to argue that Wright and other unnamed social workers are entitled to absolute immunity for their actions related to the dependency proceedings. *See* Mot. 10-11. On reply, they state that absolute immunity "applies only to certain acts taken by defendants, and not the entire set of allegations." Reply 2. Although Defendants do not expressly state this, it appears that their absolute immunity argument applies only to claims three through five. *See id.*

14

which a reasonable person would have known.'" *Moss v. U.S. Secret Serv.,* 675 F.3d 1213, 1222 (9th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine applies "if (1) the law governing the official's conduct was clearly established; and (2) under that law, the official objectively could have believed that her conduct was lawful." *Mabe*, 237 F.3d at 1106. "Where a defendant presents a qualified immunity defense in a Rule 12(b)(6) motion, 'dismissal is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies.'" *Romero v. Cty. of Washoe*, 602 Fed. Appx. 408, 409 (9th Cir. 2015) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)).

Defendants do not dispute that at the time the children were seized from their home, the law was well-established that "[t]he Fourteenth Amendment guarantees that parents will not be separated from their parents without due process of law except in emergencies." *Mabe*, 237 F.3d at 1107. Under Ninth Circuit law, "[o]fficials violate this right if they remove a child from the home absent 'information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (quoting *Mabe*, 237 F.3d at 1106). Additionally, the Fourth Amendment "protects children from removal from their homes absent such a showing," and officials "who remove a child from its home without a warrant must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Rogers*, 487 F.3d at 1294 (citations omitted).

### 1. Qualified Immunity as to Defendant Wright

As to Wright, Defendants argue that the allegations in the SAC "justify the emergency removal" of the children from their home. Mot. 12. They note that the SAC alleges that on June 4, 2014, Wright received a report from AMK's school that AMK had "bruises she got from being hit by Fred with a belt." SAC ¶ 47. Wright then visited the Kuecks' home and observed a bump on Sharon's head that she believed was caused by Fred hitting Sharon. *Id.* at ¶¶ 51, 54-55. On June 6, 2014, Wright "received a report that Fred slept in AMK's bed" and had pushed her out of the bed, injuring her knee, and later received a report that AMK "said that Fred kissed her." *Id.* at

15

¶¶ 59, 60.  According to Defendants, these allegations disclose the existence of "exigent circumstances, e.g. that the children were in danger of physical or sexual abuse."  Mot. 13.  They further assert that June 6, 2014, the date Wright received the reports of Fred sleeping in AMK's bed and kissing her, "was a Friday, meaning a warrant would have to wait until Monday."  *Id*.  Therefore, they contend, Wright is entitled to qualified immunity on this claim because her actions were objectively reasonable.

The court concludes that dismissal of the claim against Wright on the basis of qualified immunity is inappropriate at this stage given the absence of allegations in the SAC indicating that the children were in *imminent* danger of serious bodily injury.  "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant."  *Rogers*, 487 F.3d at 1294-95.  Here, the SAC contains numerous allegations that the reports of abuse were *not* corroborated by Wright's investigation.  Specifically, the SAC alleges that shortly before the children were removed, Wright visited AMK's school where school staff "said that they had observed that AMK played rough and threw herself onto the ground."  SAC ¶ 58.  The SAC further alleges that Officer Pliler visited the children's home where "[t]he children and an older brother" told him that "they have never seen a belt used to punish AMK," *id*. at ¶ 50, and both Officer Pliler and Wright observed that there were no bruises on AMK's legs during their visits to the Kuecks' home.  *See id.* ¶¶ 48-49, 51-52.

As to the reports that "Fred slept in AMK's bed" and AMK's statement at her school "that Fred kissed her," the Ninth Circuit has held that "[a]n allegation that sexual abuse occurred in the home, without additional facts regarding exigency, is insufficient to show the imminent danger of serious bodily injury necessary to intrude on a parent's custody of her child without prior judicial authorization."  *Romero*, 602 Fed. Appx. at 409 (affirming district court's denial of motion to dismiss section 1983 claim based on warrantless removal of a child on the basis of qualified immunity).  Ultimately, whether Wright had reasonable cause to believe that the children were in imminent danger of serious bodily harm is a key issue in this case.  It is inappropriate for

resolution on the pleadings. Dismissal of the first claim against Wright on the basis of qualified immunity is therefore denied without prejudice to Defendants' renewing the defense on a full record at summary judgment. *See Romero*, 602 Fed. Appx. at 409 (affirming denial of motion to dismiss with leave to pursue qualified immunity defense at summary judgment).

### 2. Qualified Immunity as to the Sheriff Deputies

Defendants next argue that the sheriff deputies are entitled to qualified immunity as to the second claim because law enforcement officers are permitted to rely on the assertions of social workers in removing children from their homes. In support, they cite *Sjurset v. Button*, 810 F.3d 609 (9th Cir. 2015). In *Sjurset*, the plaintiff brought section 1983 claims against Department of Human Services ("DHS") officials and police officers for violation of his Fourth and Fourteenth Amendment rights based on the warrantless removal of his two children from his home. *Id.* at 612-613. It was undisputed that the police officers had not participated in the decision to take the children into protective custody but had instead relied on the DHS workers' determination, and the Ninth Circuit held that the officers were entitled to qualified immunity. *Id.* at 617, 618. The court concluded that it was not clearly established at the time of the seizure that the officers violated the plaintiff's constitutional rights by acting in reliance on the DHS's protective custody determination, *id.* at 619-20, and that even if they "did violate clearly established law in entering the home and removing the children at the direction of the DHS officials," the officers "acted reasonably under the circumstances and would therefore be entitled to qualified immunity." *Id.* at 621. Noting that it is well-established that "[l]aw enforcement officers and agencies are entitled to rely on one another to a certain extent," the court found that the officers did not "act[ ] blindly at the instruction of DHS," but instead "had knowledge of the key details that informed DHS's determination." *Id.* at 621-22. These details included the children's mother testing positive for methamphetamine and other drugs shortly before the children's removal and the mother's prior conviction for child endangerment. The officers had also witnessed the parents' refusals to allow the officials to meet with or speak with the children and knew that a warrant could not be obtained for at least 36 hours. *Id.* Under such circumstances, the court concluded that the officers' "reliance on DHS's instruction was objectively reasonable." *Id.* at 622. Further, the court found

that the fact that the officers "had no reason to believe that DHS's investigation was inadequate or incompetently performed" supported the objective reasonableness of their conduct, since the officers "knew that DHS had initiated the investigation based on a reliable tip from a doctor's office, had made several attempts to carry out its investigation, and had been prevented from doing so by" the children's parents. *Id*.

Contrary to Defendants' suggestion, *Sjurset* does not stand for the proposition that officers are per se immune from liability when they "rely on the assertions of social workers in removing children from their homes." *See* Mot. 18. Instead, *Sjurset* examined the facts of the case and concluded that the officers had acted reasonably given the circumstances they faced. *See Sjurset*, 810 F.3d at 621 ("[t]he reasonableness of an officer's conduct is . . . context-sensitive and dependent upon the details known to the officers at the time" of the conduct). Here, the SAC alleges that when the officers went to the Kuecks' home with Wright, they "told Fred that they did not need any warrant because the social workers told them that the children were in immediate danger," and that "they would do whatever the social worker told them to do." SAC ¶ 62. It further alleges that the officers "blindly relied on the words of the social workers that the children were at imminent dangers of suffering serious bodily injury," "blindly followed the requests of the social workers to assist them in seizing the children," and "had time but did not make any reasonable inquiries into the validity of the requests by the social workers." *Id*. at ¶¶ 117-119. Given the limited allegations about the officers' conduct and knowledge at the time they removed the children from their home, dismissal of the second claim on the basis of qualified immunity is denied. As with the first claim against Wright, the dismissal is denied without prejudice to Defendants renewing the defense on a full record at summary judgment.

### C.    Claim Three

Claim three alleges that Wright and CFS Doe Defendants violated the children's Fourteenth Amendment rights by failing to perform a proper investigation before and after seizing the children; presenting false evidence to the court; and failing to provide the court with exculpatory evidence. SAC ¶¶ 126-143.

Defendants first argue that Wright is entitled to absolute immunity for certain actions

18

related to the dependency proceedings, including the decision to institute the proceedings and the filing and contents of the dependency petition. The Ninth Circuit has "recognized absolute immunity for social workers . . . for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents." *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003). However, "the scope of absolute immunity for social workers is extremely narrow." *Id*. Social workers "are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." *Beltran v. Santa Clara Cty*., 514 F.3d 906, 908 (9th Cir. 2008) (per curiam) (quotation omitted). Social workers are also not immune for investigatory conduct. *Id*. at 908-09. Here, Plaintiffs do not assert that Wright's institution of the dependency proceeding violated their rights. Instead, they allege that Wright's investigatory conduct, fabrication of evidence, and failure to provide exculpatory evidence led to the violation of their constitutional rights. Accordingly, absolute immunity does not apply to this claim.

Defendants next argue that the allegations in the SAC are insufficient to support claims of an alleged deficient investigation, fabrication of evidence, and failure to present exculpatory evidence.

"The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official." *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017) (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc)). In order "[t]o prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Id*. at 798 (citing *Costanich v. Dep't of Soc. & Health Servs*., 627 F.3d 1101, 1111 (9th Cir. 2010)). A plaintiff can establish a claim of deliberate fabrication by circumstantial or direct evidence. "For example, evidence that officials 'continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent' can raise the inference that the investigator has an 'unlawful motivation' to frame an innocent person." *Id*. at 793 (internal citation omitted). "Or deliberate fabrication can be shown by direct evidence, for example, when 'an interviewer . . .

19

deliberately mischaracterizes witness statements in her investigative report.'" *Id.* (citation omitted). However, the Ninth Circuit has held that "there is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way." *Devereaux*, 263 F.3d at 1075. Further, an investigator's carelessness or inaccuracy during an investigation does not establish a constitutional violation. *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003). Therefore, Plaintiffs cannot maintain a constitutional claim premised solely on Wright's alleged deficient investigation prior to and following the seizure of the children.

As to Plaintiffs' fabrication of evidence claim against Wright, they allege that Wright presented three falsehoods to the court: 1) "that Fred committed domestic violence on Sharon causing the bump on her head," even though Sharon told her that she had had the bump since childhood; 2) "that an older sibling called her to report that Fred hit Sharon when in fact he called her to tell her about AMK's true conditions (i.e., she is easily bruised, mentally delayed, felt [sic[ down a lot, etc.) and that he did not see any physical abuses by Fred on the children"; and 3) "that Fred slept in AMK's bed. AMK sometimes went to her parent beds [sic] to seek security as young children often do." SAC ¶¶ 137-138. They further allege that as a result of Wright's presentation of false evidence, their Fourteenth Amendment rights were violated when they were seized from their parents without a warrant and placed in foster care. *Id.* at ¶ 142.

In their motion, Defendants challenge the credibility and significance of the first and third alleged falsehoods. *See* Mot. 16-17. They do not address Plaintiffs' allegation that Wright lied about the older sibling's report that AMK is "easily bruised, mentally delayed, fel[l] down a lot" and that he had not witnessed physical abuse by Fred. Accepting the allegations in the SAC as true, the court concludes that Plaintiffs have adequately stated a claim for deliberate fabrication of evidence.

Plaintiffs also bring a Fourteenth Amendment claim based on Wright's failure to provide the court with exculpatory evidence following the seizure of the children. Plaintiffs allege that after the children were taken into custody, Wright and the CFS Defendants were unable to "obtain any incriminating evidence from interrogation sessions of the children" but failed to request

dismissal of the case. They further allege that Wright and the Doe Defendants learned that "AMK continued to suffered [sic] bruises and exhibits [sic] the same behavioral problems and that LTK became worse off," but "did not disclose this exculpatory evidence to the court." SAC ¶¶ 140, 141.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the prosecution violates a defendant's due process rights if it fails to turn over evidence that is 'material either to guilt or to punishment.'" *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *Brady*, 373 U.S. at 87). It is not clear whether the *Brady* rule applies to civil child dependency proceedings, *see Clarke v. Upton*, No. CV-F-07-888OWWSMS, 2009 WL 1460815, at *18 (E.D. Cal. May 26, 2009) (collecting cases), and Plaintiffs offer no authority supporting such a claim. However, even if *Brady* applies in such proceedings, Plaintiffs have failed to state a claim based upon an alleged failure to turn over exculpatory evidence. In the Ninth Circuit, the test for a due process violation based on the *Brady* rule is as follows: a party "must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted." *Raley*, 470 F.3d at 804.

Here, the allegedly exculpatory information that Wright and the CFS Defendants failed to turn over was evidence of AMK continuing to suffer bruises and exhibit the same behavioral problems that she exhibited before she was removed from the Kuecks' home. However, this information is not exculpatory, as it does not exculpate the allegations in the dependency petition that Fred physically abused his children and may have sexually abused AMK. Moreover, Wright and the CFS Defendants could have learned of the allegedly exculpatory evidence only *after* the detention hearing. Therefore, they could not have turned over the evidence prior to the detention hearing. Accordingly, Plaintiffs' third claim based upon withholding of exculpatory evidence is dismissed. As Plaintiffs have not previously been granted leave to amend this claim, the dismissal is without prejudice and with leave to amend.

### D. Claims Four and Five, Failure to Protect

Claim four is a section 1983 claim for violation of the Fourteenth Amendment by AMK against CFS Doe Defendants for failing to properly screen Mallett as a foster parent and placing

United States District Court
Northern District of California

AMK in his home, and failing "to monitor the health and safety of foster children including AMK who were put in Mallett's home." SAC ¶ 149. Plaintiffs allege that "AMK had a clearly established right to be protected from harms while she was under the custody of CFS." *Id*. at ¶ 146. Similarly, claim five is a section 1983 claim for violation of the Fourteenth Amendment by LTK against CFS Doe Defendants for the cut lip that he suffered in foster care. SAC ¶ 156.

"The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010). "To violate due process, state officials must act with such deliberate indifference to the liberty interest that their actions 'shock the conscience.' Conduct that 'shocks the conscience' is 'deliberate indifference to a known or so obvious as to imply knowledge of, danger.'" *Id*. at 844 (internal citations omitted). As applied to children in foster care, the deliberate indifference standard "requires a showing of an objectively substantial risk of harm and a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference." *Id*. at 845.

Here, the SAC does not plead any facts supporting a claim that County employees were deliberately indifferent to an "objectively substantial risk of harm" posed by the foster parents or families with which AMK and LTK were placed. There are no allegations that the County knew that either home was unsafe at the time it placed the children. With respect to AMK's placement with Mallett, although the SAC alleges that Mallett "molested many foster children put in his home," it does not allege that Mallett abused AMK. *See* SAC ¶ 75. Instead, it alleges that AMK "came home with numerous bruises and wearing training pants," *id*. at ¶ 79, but does not allege that Mallett was responsible for the bruising or the fact that she was wearing training pants. It also does not allege that any County employee was aware of the danger Mallett posed when placing AMK in his home nor does it allege any facts to support the inference that County employees should have been aware of the danger he posed at that time. While Plaintiffs allege that a former foster child reported Mallett to law enforcement, they do not allege when this happened. Instead,

they allege that Mallett was killed in 2016, two years after AMK was returned to her parents.

As to LTK, Plaintiffs do not allege the cause of LTK's cut lip. They also do not allege any connection between County employees and the injury, such as LTK's placement in the home of a foster parent known to be violent.

In sum, Plaintiffs have failed to state Fourteenth Amendment substantive due process claims based on their placement in foster care and injuries while in foster care. At the hearing, Plaintiffs' counsel conceded that he is unable to allege additional facts to support these claims. Accordingly, the fourth and fifth claims are dismissed with prejudice.[5]

### E.     Claims Six and Seven for Municipal Liability

The sixth and seventh claims are for municipal liability under *Monell*.

A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement 'was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality,' and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).

---

[5] As the court concludes that the SAC does not state a claim based on an alleged failure to protect the children while they were in foster care, it does not reach Defendants' argument that the CFS Doe Defendants are entitled to absolute immunity against those claims.

In order to establish *Monell* liability, a plaintiff must prove that (1) he or she possessed a constitutional right of which he was deprived; (2) "that the municipality had a policy"; (3) "that this policy amounts to deliberate indifference to the plaintiff's constitutional right"; and (4) "that the policy is the moving force behind the constitutional violation." *Dougherty*, 654 F.3d at 900 (quotation omitted). "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). However, an isolated constitutional violation may be sufficient to establish a municipal policy in the following three situations: 1) "when the person causing the violation has 'final policymaking authority,'" *see id*. at 1235; 2) when "the final policymaker 'ratified' a subordinate's actions," *see id*. at 1238; and 3) when "the final policymaker acted with deliberate indifference to the subordinate's constitutional violations." *See id*. at 1240.

In claim six, Plaintiffs allege that the County "established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Social Worker Defendants when Plaintiffs' constitutional rights were violated by and/or through their seizures without a warrant or other court order in the absence of any exigency." SAC ¶ 162. They allege that CFS "has a long history of staffing issues," including "massive staff turn-overs and a dysfunctional agency." *Id*. at ¶¶ 163, 165. Plaintiffs allege upon information and belief that social workers like Wright "usually are overwhelmed because of heavy caseloads and unreasonable demands," and as a result, "take short cuts causing mistakes" like those in this case. *Id*. at ¶ 166. They further allege that "CFS has policy, practice, and training that cause confirmation bias," "a policy, practice, and training of social workers putting priority on finding faults," and "a practice to pile on numerous allegations, as in this case where Fred was also accused of domestic violence." *Id*. at ¶¶ 167-169. Plaintiffs allege that the County also has a practice of "mak[ing] up allegations to make accusations against both parents . . . to take all the children instead of sorting out the risk posed by the alleged parent abusers," "a policy, practice, and training favoring taking children from family," including the "unnecessary taking all children from the home upon allegation[s] of abuse and neglect of one child." *Id*. at ¶¶ 172, 174, 176. Finally, they allege that "CFS has a preference for taking children

24

from their home and family separation because they want to maximize the amount of" federal money it receives. *Id*. at ¶ 178.

The court concludes that the allegations in the SAC are insufficient to plead a custom, practice, or policy by the County that caused Plaintiffs' injuries. First, with respect to the alleged customs and practices at issue here, the SAC alleges only facts specific to the seizure of AMK and LTK. Although Plaintiffs allege numerous customs and practices related to the County's investigations of abuse allegations and separating children from their parents, such as "confirmation bias," "pil[ing] on numerous allegations . . . in the detention reports," "mak[ing] up allegations to make accusations against both parents . . . to take all the children," "favoring taking children from family," and "unnecessary taking all children from the home upon allegation of abuse and neglect of one child," (*see* SAC ¶¶ 167, 169, 172, 174, 176), the SAC contains no factual allegations to support the existence of a practice or custom beyond the dependency proceedings involving Plaintiffs. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Absent from the SAC are any facts supporting Plaintiffs' claim that the County regularly takes certain actions related to fabricating allegations of abuse and removing children from their parents. *See Bagley v. City of Sunnyvale*, No. 16-CV-02250-LHK, 2017 WL 344998, at *15 (N.D. Cal. Jan. 17, 2017) (finding custom or practice inadequately pleaded where plaintiff only pleaded actions relating to his own arrest and prosecution).

As to Plaintiffs' allegations of unconstitutional policies, an isolated constitutional violation may be sufficient to establish a municipal policy in the following three situations: 1) "when the person causing the violation has 'final policymaking authority,'" *see id*. at 1235; 2) when "the final policymaker 'ratified' a subordinate's actions," *see id*. at 1238; and 3) when "the final policymaker acted with deliberate indifference to the subordinate's constitutional violations." *See id*. at 1240. Plaintiffs allege that the County has the following policies, many of which overlap with the practice and custom allegations described above: "policy, practice, and training that cause

25

confirmation bias" (SAC ¶ 167); a policy of "putting priority on [social workers] finding faults, often employing a boilerplate template and a computer program to assess risk, to make decision[s] and to level charges against parents" (SAC ¶ 168); a policy of "not admit[ting] to and discipline[ing] their social workers for fabricating evidence" (SAC ¶ 170); a policy "favoring taking children from family" (SAC ¶ 174); and a policy "favoring unnecessary taking all children from the home upon allegation of abuse and neglect of one child" (SAC ¶ 176). These policy allegations are insufficiently specific to plead a *Monell* claim, because the SAC contains no factual allegations that Wright, who committed the alleged constitutional violations, was an individual with final policymaking authority, that the violations were ratified by a final policymaker, or that a final policymaker acted with deliberate indifference to Wright's violations.

It appears that the SAC also attempts to plead a failure to train theory of *Monell* liability. In order to establish that a municipality is liable under *Monell* based on inadequacy of training, Plaintiffs must show that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Here, the SAC contains the following allegations regarding the County's alleged training of its social workers: that the County has "training that cause[s] confirmation bias" (SAC ¶ 167); that the County trains social workers to "put[ ] priority on finding faults" (SAC ¶ 168); that the County trains social workers to "favor[ ] taking children from family" and to unnecessarily "tak[e] all children from the home upon allegation of abuse and neglect of one child" (SAC ¶¶ 174, 176). These allegations are insufficient, as the SAC does not allege with any specificity what training the County social workers received and does not allege that any County policymaker was aware that the training was deficient. Plaintiffs have insufficiently alleged a "failure to train" theory of *Monell* liability.

Plaintiffs' seventh claim for municipal liability fares no better. Plaintiffs allege upon information and belief that the County's Sheriff Office "has a practice, policy or training for, or deliberate indifference to their officers to automatically [sic] accept, believe and trust any allegations of abuse and claims of exigency from CFS social workers without independently questioning whether a warrant is necessary." SAC ¶ 184. They further allege that it "has a

26

practice, policy, or training for or deliberate indifference to their officers not question [sic] whether there is any other least intrusive method that could be used to avoid family separation, traumas for the children and families." *Id*. at ¶ 186. As with the sixth claim, the SAC does not allege any facts supporting the existence of a practice or custom beyond the seizure of Plaintiffs. As to the alleged policies, the SAC does not allege that the sheriff deputies had final policymaking authority, that the constitutional violations committed by the sheriff deputies were ratified by a final policymaker, or that a final policymaker acted with deliberate indifference to the sheriff deputies' violations. Finally, with respect to a failure to train theory of *Monell* liability, Plaintiffs do not allege any facts about the training sheriff deputies receive or whether any County policymaker was aware that the training was deficient. Accordingly, Plaintiffs' seventh claim must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is granted in part and denied in part. Plaintiffs' third claim based upon withholding of exculpatory evidence is dismissed with leave to amend. Claims four and five are dismissed with prejudice. Claims six and seven are dismissed with leave to amend. Any third amended complaint must be filed within 14 days of the date of this order. Plaintiffs are given one final opportunity to plead their best case in a third amended complaint in a manner consistent with this order. Plaintiffs may not add any new claims without leave of court.

**IT IS SO ORDERED.**

Dated: September 23, 2019



Donna M. Ryu
United States Magistrate Judge